IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

----

BANK OF AMERICA, N.A., )
  ) 2:07-cv-1584-GEB-EFB
        Plaintiff and )
        Counterdefendant, )
  )
  v. ) ORDER*
  )
HENSLEY PROPERTIES, L.P., )
  )
        Defendant and )
        Counterclaimant. )

----

        Plaintiff Bank of America ("BoA") moves to dismiss Defendant Hensley Properties' ("Hensley") counterclaims under Federal Rule of Civil Procedure 12(b)(6),[1] contending that the counterclaims "are a transparent . . . attempt . . . to avoid . . . obligations under a[n] . . . executed written interest rate swap contract . . . ." (BoA's Not. of Mot. and Mot. to Dismiss Counterclaims ("Mot.") at 1:4-6.) Hensley couunterclaims "for fraud and breach of duty," arguing that

----

    *    This matter was determined to be suitable for decision without oral argument.  L.R. 78-230(h).

    [1]    All subsequent references to "Rules" are to the Federal Rules of Civil Procedure.

1

BoA fraudulently induced Hensley into entering into the contract and that BoA thereby breached its duty of care to Hensley.

<u>HENSLEY'S FACTUAL ALLEGATIONS</u>

Hensley is a real estate partnership that owns residential properties in California. (Hensley's Ans. and Counterclaims ("Counterclaims") ¶ 5.) Hensley was principally owned by Marjorie Bright until her death in 2005. (<u>Id.</u> ¶ 6.) Cheryl Bright ("Bright") succeeded to Marjorie Bright's interest in Hensley. (<u>Id.</u>) Bright's "training and career experience was primarily as a teacher." (<u>Id.</u> ¶ 7.)

In June 2006, Hensley learned that Bank of the West ("West") was threatening to accelerate a $26 million mortgage loan to Hensley that was secured by three Hensley properties. (<u>Id.</u> ¶ 8.) Hensley needed to find alternate financing to avoid foreclosure. (<u>Id.</u>)

In July and August of 2006, Bright met with BoA personnel several times to discuss the possibility of obtaining a new mortgage loan from BoA that would replace the West mortgage and the loan would be secured by the same three properties. (<u>Id.</u> ¶¶ 11-22.)

Hensley alleges that during these meetings BoA personnel, including David Yonan ("Yonan"), made a "series of false statements" to Bright "designed to convince" her that she was merely entering into a "forward rate lock" agreement, when in fact the purported legal effect of the documents she eventually signed was far different and more onerous. (<u>Id.</u> ¶ 16, 22.) Hensley understood "forward rate lock" to mean that the mortgage interest rate would be "locked (not subject to market fluctuation) during a defined period of time." (<u>Id.</u> ¶ 13.) If the new loan was completed within the stated time period, the interest rate would be set at the locked rate. (<u>Id.</u>) On August 9,

2006, BoA personnel told Bright that it could offer Hensley a "60 day forward rate lock." (Id. ¶¶ 11-12.)

On August 11, 2006, Bright signed a document titled "Proposed Interest Rate Swap (Forward Rate Lock)" ("the Proposal"). (Id. ¶ 11 & Ex. 1.) Hensley alleges that Bright signed the Proposal "in reliance" on the false statements of BoA personnel that Hensley was only agreeing to a "forward rate lock." (Id. ¶ 15, 19.) BoA personnel had brought a print-out of a slide presentation to the August 11 meeting called "Interest Rate Hedging Discussion," but no slide presentation was made. (Id. ¶ 18.) When Bright signed the Proposal, BoA was aware that she had neither conducted a "thorough" and "independent" review of the transaction, nor read the printed-out slide presentation. (Id.)

Sometime after August 11, Yonan returned to Bright's office and insisted that she sign a confirmation letter ("the Confirmation"). (Id. ¶ 22; Pls.' Compl., Ex. A.) Yonan represented the Confirmation was necessary to effectuate the "forward rate lock." (Counterclaims ¶ 22.) Bright told Yonan that Hensley may not want to go through with the new mortgage loan, but Yonan insisted that Bright sign the Confirmation anyway, as it would provide the "forward rate lock." (Id.) Bright signed the Confirmation. (Id. ¶¶ 22, 26.) The Confirmation states that it incorporates the "Form 2002 ISDA Master Agreement" ("the ISDA"). Bright did not see the ISDA until it was given to her on October 13, 2006, long after Bright signed the Confirmation. (Id. ¶¶ 24-26.)

The Proposal and the Confirmation did not constitute a "forward rate lock," but instead constituted an "exotic and risky form of derivative security" called an "interest rate swap." (Id. ¶¶ 16-

3

17.)  The "interest rate swap" purports to obligate BoA to pay Hensley the prevailing "LIBOR"[2] interest rate and Hensley to pay BoA a fixed interest rate of 7.39% every month for 10 years, with both amounts calculated as a percentage of twenty-six million dollars.  (Id., Ex. 1.)  Hensley alleges that the "interest rate swap" is essentially a "bet on the direction of interest rates over the next 10 years."  (Id. ¶ 17.)  Hensley further alleges that BoA was aware that Bright was "not equipped to understand and evaluate the risks inherent in an interest rate swap."  (Id. ¶ 18.)

In September or October 2006, Hensley learned that West had determined not to accelerate its mortgage loan, so there was no longer any need to go through with the new BoA mortgage loan.  (Id. ¶ 28.) BoA then informed Hensley that, even though Hensley would not need the new mortgage loan, Hensley had already agreed to the 10-year "interest rate swap."  (Id. ¶ 29.)

When Hensley did not pay the first installment under the "interest rate swap," BoA filed suit, claiming that Hensley had breached the contract and that BoA was entitled to "early termination" penalties of more than one million dollars.  (Pls.' Compl. ¶¶ 11-15.)[1]
///
///
///
///

---

[2]  The parties use the term "LIBOR," which according to Black's Law Dictionary, stands for "London Interbank Offered Rate."

[1]  BoA originally sued in federal court in New York.  See Bank of Am., N.A. v. Hensley Props., LP, 495 F. Supp. 2d 435 (S.D.N.Y. 2007). The New York district court transferred venue to the Eastern District of California because there was no personal jurisdiction over Hensley and venue was improper in New York.  Id. at 439-40.

DISCUSSION[2]

## I. Choice of Law

The parties dispute whether New York or California law controls. (Hensley's Opp'n to Pls.' Mot. to Dismiss Counterclaims ("Opp'n") at 11 n.5.; BoA's Reply at 3 n.1.)

The Confirmation contains a choice-of-law clause stating: "Governing law: the laws of the State of New York (without reference to the conflict of the laws provisions thereof)." (BoA's Compl., Ex. A.) Whether this choice-of-law clause is enforceable is governed by California law. See ABF Capital Corp. v. Osley, 414 F.3d 1061, 1065 (9th Cir. 2005) (applying California law to determine enforceability of choice-of-law clause). The choice of law clause is enforceable unless "(1) [New York] has no substantial relationship to the parties or their transaction, and there is no other reasonable basis for the parties' choice," or "(2) [New York] law is contrary to a fundamental policy of [California], and [California] has a materially greater interest in the matter than does [New York]." Frontier Oil Corp. v. RLI Ins. Co., 153 Cal. App. 4th 1436, 1451 (2007), citing Nedlloyd Lines B.V. v. Superior Court, 3 Cal. 4th 459, 464-466 (1992).

Hensley argues that California law governs because the counterclaims are tort claims. (Opp'n at 11 n.5.) However, where tort claims arise from a contract containing a choice-of-law clause, the choice-of-law clause governs the tort claims as well as any contract claims. Olinick v. BMG Entm't, 138 Cal. App. 4th 1286, 1299-1300 (2006) (holding that choice-of-law clause governed both tort and contract claims because "the legal relationship between [the]

---

[2] The Rule 12(b)(6) dismissal motion standards are well known and need not be repeated here.

parties emanate[d] from th[e] [a]greement [containing the choice-of-law clause] and the interpretation of the [a]greement will be a central issue in the . . . case").

Since Hensley has not demonstrated that the choice-of-law clause should not be enforced, New York law is applied to the dismissal motion sub judice.

II. Fraud Counterclaim

BoA seeks dismissal of Hensley's fraud counterclaim, arguing that Hensley's reliance on BoA's alleged misrepresentations was not reasonable because the Proposal and the Confirmation expressly stated that the transaction was an "interest rate swap." (Mot. at 12:12-14:2.)

To state a claim for fraud, Hensley must allege that it reasonably relied on BoA's misrepresentations. Wynn v. AC Rochester, 273 F.3d 153, 156 (2d Cir. 2001). Hensley argues that whether its reliance was reasonable is an issue of fact that cannot be decided on a Rule 12(b)(6) dismissal motion. (Opp'n at 14:1-17:6.) However, "[u]nder New York law, reasonable reliance is precluded when 'an express provision in a written contract contradicts a prior alleged oral representation in a meaningful fashion.'" Republic Nat. Bank v. Hales, 75 F. Supp. 2d 300, 315 (S.D.N.Y. 1999) (quoting Villa Marin Chevrolet v. Gen. Motors Corp., 1999 WL 1052494, at *5 (E.D.N.Y. Nov.18, 1999); see Village On Canon v. Bankers Trust Co., 920 F. Supp. 520, 531 (S.D.N.Y. 1996) (dismissing fraud claim under Rule 12(b)(6) since plaintiff's "allegations [we]re flatly contradicted by the[] express terms" of the written agreement).

Hensley argues that it was entitled to rely on BoA's misrepresentations because Hensley was in a special relationship with

BoA. (Opp'n at 14:12-14.) However, "even if [Hensley meets] its burden of presenting sufficient facts to show that a special relationship existed between the parties," Hensley cannot reasonably rely on BoA's misrepresentations because those misrepresentations are contradicted by the Proposal and the Confirmation. See Burroughs Corp. v. Datacap, Inc., 507 N.Y.S.2d 882, 884 (N.Y. App. Div. 1986); see also Dorsey Products Corp. v. U.S. Rubber Co., 251 N.Y.S.2d 311, 313 (N.Y. App. Div. 1964) ("[Even if] there is merit in plaintiffs' contention that a relationship does exist which implies a closer degree of trust and reliance than the ordinary buyer-seller relationship, that fact is of no moment in this connection [since] [t]he very instrument which creates the relationship . . . negatives the right to rely on statements.").

Since Hensley has not alleged facts demonstrating reasonable reliance, BoA's motion to dismiss Hensley's fraud counterclaim is granted.

III. Breach of Duty Counterclaim

BoA seeks dismissal of Hensley's counterclaim for breach of duty, arguing that BoA does not owe any fiduciary duty to Hensley. (Mot. at 7:9-11.) Hensley counters that it "has not claimed that the duty owed by BoA was fiduciary in nature." (Opp'n at 11:7.) Instead, Hensley argues that "BoA as advisor and seller of a financial product had a tort duty to make accurate statements." (Opp'n at 11:7-17.) "Courts have stated that banks owe a duty of care to their customers." Dubai Islamic Bank v. Citibank, N.A., 126 F. Supp. 2d 659, 667 (S.D.N.Y. 2000); Bank Brussels Lambert, S.A. v. Intermetals Corp., 779 F. Supp. 741, 747 (S.D.N.Y. 1991)(finding that "it is true without question that [bank] had a duty to exercise reasonable skill and care

7

1 | in carrying out its activities for its customer"). Accordingly, BoA's
2 | motion to dismiss Hensley's breach of duty counterclaim is denied.

## CONCLUSION

For the foregoing reasons, BoA's dismissal motion is granted as to Hensley's fraud counterclaim, and denied as to Hensley's breach of duty counterclaim.  Hensley is granted ten days leave from the date on which this order is filed to file amended counterclaims in which the dismissed counterclaim is amended.

IT IS SO ORDERED.

Dated:  December 28, 2007

_____
GARLAND E. BURRELL, JR.
United States District Judge